UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------x

OHIO SECURITY INSURANCE COMPANY,                    Civil Action No.
                                                    1:24-cv-03971-AS

                              Plaintiff,

        -against-

UTICA FIRST INSURANCE COMPANY and
TRAVELERS INDEMNITY COMPANY,

                              Defendants.

---------------------------------------------------------------------------x


**OHIO SECURITY INSURANCE COMPANY'S MEMORANDUM
OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**


Jaffe & Asher LLP
445 Hamilton Avenue, Suite 405
White Plains, New York 10601
(212) 687-3000

Attorneys for Plaintiff
Ohio Security Insurance Company

## **TABLE OF CONTENTS**

**PRELIMINARY STATEMENT** ................................................................................1

**STATEMENT OF MATERIAL FACTS**..................................................................3

   A.    The Underlying Action ...................................................................3

   B.    Contracts ..........................................................................................6

        1.   The DMV Subcontract ....................................................6

        2.   The DDS Subcontract .....................................................7

   C.    The Insurance Policies .....................................................................9

        1.   The Ohio Security Policy.................................................9

        2.   The Utica Policy ..............................................................9

        3.   The Travelers Policy .....................................................13

   D.    Tenders and Responses ..................................................................16

**ARGUMENT**....................................................................................................17

Point I

   UTICA AND TRAVELERS OWE HUNT A DUTY TO DEFEND .........................17

      A.  New York Law .............................................................................17

      B.  Utica Owes A Duty to Defend.....................................................19

      C.  Travelers Owes A Duty to Defend ..............................................20

Point II

   UTICA AND TRAVELERS OWE HUNT A DUTY TO INNEMNIFY ..............21

Point III

   THE UTICA POLICY AND THE TRAVELERS POLICY APPLY
   PRIMARY AS COMPARED TO THE OHIO SECURITY POLICY....................24

**CONCLUSION** ...............................................................................................25

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>

<u>All State Interior Demolition Inc. v. Scottsdale Ins. Co.</u>,
168 A.D.3d 612, 92 N.Y.S.3d 256 (1st Dep't 2019)......................................................18

<u>AVR-Powell C Development Corp. v. American States Ins. Co.</u>,
No.159600/2017, 2021 WL 1331348 (N.Y. Sup. Ct. Apr. 09, 2021) ...........................18

<u>Axis Constr. Corp. v. Travelers Indem. Co. of Am.</u>,
No. 220CV1125DRHARL, 2021 WL 3912562 (E.D.N.Y. Sept. 1, 2021) ...................18

<u>Bedford Cent. Sch. Dist. v. Com. Union Ins. Co.</u>,
295 A.D.2d 295, 742 N.Y.S.2d 671 (2d Dep't 2002)..............................................21, 22

<u>BP Air Conditioning Corp. v. OneBeacon Ins. Grp.</u>,
8 N.Y.3d 708, 840 N.Y.S.2d 302 (2007).......................................................................17

<u>City of New York v. Evanston Ins. Co.</u>,
39 A.D.3d 153, 830 N.Y.S.2d 299 (2d Dep't 2007) ................................................19, 20

<u>Fieldston Prop. Owners Assoc., Inc. v. Hermitage Ins. Co.</u>,
16 N.Y.3d 257, 920 N.Y.S.2d 763 (2011).................................................................24, 25

<u>Fitzpatrick v. American Honda Motor Co.</u>,
78 N.Y.2d 61, 571 N.Y.S.2d 672 (1991)........................................................18, 19, 20

<u>Frank v. Linchrisnental Cas. Co.</u>,
123 A.D.3d 878, 999 N.Y.S.2d 836 (2d Dep't 2014)....................................................18

<u>GMM Realty, LLC v. St. Paul Fire & Marine Ins. Co.</u>,
129 A.D.3d 909, 11 N.Y.S.3d 661 (2d Dep't 2015)......................................................17

<u>Liberty Ins. Corp. v. New York Marine & Gen. Ins. Co.</u>,
No. 22CV1081 (DLC), 2023 WL 2597053 (S.D.N.Y. Mar. 22, 2023).......................21

<u>Linchrisnental Cas. Co. v. Rapid-Am. Corp.</u>,
80 N.Y.2d 640, 593 N.Y.S.2d 966 (1993).....................................................................17

<u>Maldonado v. Kissm Realty Corp.</u>,
18 A.D.3d 627, 796 N.Y.S.2d 619 (2d Dep't 2005)......................................................22

<u>Maxwell v. Toys "R" US-NY Ltd. P'ship</u>,
269 A.D.2d 503, 702 N.Y.S.2d 651 (2d Dep't 2000)..............................................24, 25

One Reason Rd., LLC v. Seneca Ins. Co., Inc.,
163 A.D.3d 974, 83 N.Y.S.3d 235 (2d Dep't 2018) .......................................................................21

Regal Constr. Corp. v. National Union Fire Ins. Co. of Pittsburgh, PA,
15 N.Y.3d 34, 904 N.Y.S.2d 338 (2010) ........................................................................................18

Servidone Const. Corp. v. Sec. Ins. Co. of Hartford,
64 N.Y.2d 419, 488 N.Y.S.2d 139 (1985) ......................................................................................22

Sport Rock Int'l, Inc. v. American Cas. Co. of Reading, PA,
65 A.D.3d 12, 878 N.Y.S.2d 339 (1st Dep't 2009) ...................................................................18, 24

Tishman Constr. Corp. v. American Mfrs. Mut. Ins. Co.,
303 A.D.2d 323, 757 N.Y.S.2d 535 (1st Dep't 2003) ...............................................................24, 25

Travelers Prop. Cas. Co. of Am. v. Harleysville Ins. Co. of New York,
67 Misc. 3d 1227(A), 2020 WL 3089269 (Sup. Ct. N.Y. Cty. Jun. 5, 2020) ...........................19, 20

United States Underwriters Ins. Co. v. Image By J & K, LLC,
335 F. Supp. 3d 321 (E.D.N.Y. 2018) ............................................................................................21

Vargas v. City of New York,
158 A.D.3d 523, 71 N.Y.S.3d 415 (1st Dep't 2018) ......................................................................19

Zurich Am. Ins. Co. v. Scottsdale Ins. Co.,
No. 22-CV-364 (JGLC), 2024 WL 1138917 (S.D.N.Y. Mar. 15, 2024) .......................................21

## PRELIMINARY STATEMENT

Plaintiff OHIO SECURITY INSURANCE COMPANY ("Ohio Security") submits this

memorandum of law in support of its motion for an Order, pursuant to Fed. R. Civ. P. 56,

granting summary judgment against defendants UTICA FIRST INSURANCE COMPANY

("Utica") and TRAVELERS INDEMNITY COMPANY ("Travelers") as follows:  (1)

determining and declaring that Utica and Travelers each owe a duty to defend and indemnify

James Hunt Construction Co., Inc. ("Hunt") for the claims alleged in the underlying action

entitled The Gap, Inc. v. James Hunt Construction Co., Inc., Index No. 152410/2022, pending in

the Supreme Court of the State of New York, County of New York (the "Underlying Action"),

and that such coverage would apply on a primary basis before coverage under Ohio Security's

policy issued to Hunt applies; (2) granting a money judgment against Utica and Travelers, jointly

and severally, in the sum of $22,932, representing defense costs incurred and paid through

November 25, 2024, plus interest at 9% per annum from July 26, 2023;[1] and (3) granting Ohio

Security the costs and disbursements of this action, together with such other and further relief as

this Court deems just and proper.

The Underlying Action arises from property damage allegedly sustained as a result of

water leaks occurring on or about July 4, 2020 and November 7, 2020, from brass Apollo ball

valves that were installed as part of the installation of an HVAC system at an Old Navy store

located at 147 East 86th Street, New York, NY 10028 (the "Premises").  The Gap, Inc. ("Gap")

alleges that the total amount of damages sustained due to the water damages is $549,867.27.

Gap contracted with Hunt, as general contractor, to perform certain construction work at

---

[1] July 26, 2023 represents the mid-date between the date of the first invoice, April 11, 2022, and the last invoice, November 8, 2024.  "Where such damages were incurred at various times, interest shall be computed . . . from a single reasonable intermediate date."  N.Y. C.P.L.R. § 5001(b).

1

the Premises. Hunt, in turn, subcontracted with D.M.V. Mechanical Inc. ("DMV"), to perform certain HVAC work at the Premises. DMV, in turn, sub-subcontracted with D.D.S. Mechanical Plumbing & Heating Corp. ("DDS").

Hunt qualifies as an additional insured under the Utica Policy (as defined below), which was issued to DMV as a Named Insured, pursuant to an additional insured endorsement that makes Hunt an additional insured because (1) DMV agreed in the DMV Contract (as defined below) with Hunt to include Hunt as an additional insured on its general liability policy; (2) the DMV Contract was executed prior to the alleged property damage and in effect during the term of the Utica Policy; and (3) the Underlying Action is for liability caused by DMV's subcontractor, DDS.

Hunt qualifies as an additional insured under the Travelers Policy (as defined below), which was issued to DDS as a Named Insured, pursuant to an additional insured endorsement entitled "Blanket Additional Insured Endorsement (Includes Products-Completed Operations If Required By Contract)" that makes Hunt an additional insured because (1) DDS agreed in the DDS Contract (as defined below) to include Hunt as an additional insured on its general liability policy; and (2) the Underlying Action is for "property damage" included in the "products-completed operations hazard", and arising out of DDS' "product" or DDS' "work", as those terms are defined in the Travelers Policy.

There is also no reasonable dispute that, based upon a review of the policies' respective "Other Insurance" provisions, both the Utica Policy and the Travelers Policy apply primary to the Ohio Security Policy (as hereinafter defined).

## <u>STATEMENT OF MATERIAL FACTS</u>

### A.    The Underlying Action

On or about March 21, 2022, Gap commenced the Underlying Action.  In the Underlying Action, Gap alleges that, on or about July 4, 2020, it sustained property damage due to water leaking from an Apollo ball valve that was installed as part of the installation of an HVAC system at the Premises.  Gap further alleges that on or about November 7, 2020, Gap again sustained extensive property damage due to water leaking from an Apollo ball valve that was installed as part of the installation of an HVAC system at the Premises. Gap alleges that its total damages equal $549,867.27.

In the Underlying Action, Gap's counsel produced a Materials Report discussing the failure of the two Apollo ball valves.  The report concludes as follows:

> Both valves showed circumferential fractures with morphology consistent with brittle fracture and fast crack propagation leading to sudden and catastrophic failure of the valve bodies. Both valves show tool markings along the adapter side and valve body. **The valve fractured due to overtightening of the valves** as evidenced by the tool markings on the bodies of both valves and adapters, lack of material defects, short duration between installation and failure, and brittle fracture morphology consistent with sudden and catastrophic failure.  (Emphasis supplied.)

In the Underlying Action, on April 11, 2024, the parties deposed Derrick Vella, the owner of DMV, and Savvas Karamalis, the Operations Manager of DDS.  Mr. Vella, regarding the project, testified as follows:

> Q.  The work that was performed at that Old Navy Store that I provided the location for before, was that done by D.M.V. or some other entity?
>
> A.  Well, the piping was done by D.D.S. Mechanical which was a subcontractor of ours.
>
> Q.  The work that you performed, that was done by D.M.V. as opposed to some other entity?
>
> A.  Correct.

3

* * *

Q.  Do you recall the nature or the extent of the work that D.M.V. contracted to perform?

A.  Yes.

Q.  Can you describe that work for me?

A.  Furnish and install units supplied by James Hunt Construction, furnish and install piping, ductwork, installation, condensate lines.

* * *

Q.  Describe for me what, if anything, D.M.V. did in relation to either a condenser water line or a chilled water line at this Old Navy location?

A.  So we took from the point of connection which the building gave us we installed copper piping and valves to each unit.

Q.  Who provided the copper piping and valves?

A.  That was my subcontractor which was D.D. S. Mechanical.

* * *

Q.  Would anyone from James Hunt be present when D.M.V. was performing the work and telling D.M.V. how to do their work?

A.  No.

Q.  Did anyone from James Hunt tell D.M.V. what tools or equipment to use in performing their work?

A.  No.

* * *

Q.  When the copper piping and the valves were installed that we discussed earlier, that was work that was performed I [sic.] by D.D.S., correct?

A.  Yes.

* * *

4

Q. When was the first time that you became aware that there was any problem or issues with these valves or piping?

A. I believe it was in July.

Q. Of what year?

A. I guess it was 2020.

Q. What did you hear or what did you find out?

A. We found out that there was a leak coming from a valve and I was first on scene actually from any of us and we found a valve that was cracked. It was a stress crack.

Q. This valve that had the stress fracture, am I correct in saying that resulted in the leak?

> MR. IVANY: Objection.
> You may answer. Derrick, you may answer.

A. Yes, that's where the first leak came from.

Q. The valve where that first leak came from, that's one of the valves that was installed by D.D.S.?

A. Correct. The valves that were going bad were chilled water valves. Now also they had temperature recordings and at certain points the valves, the water temperature was at or below freezing.

\* \* \*

Q. And the portion of the system that leaked here is the Apollo valve cracked, correct?

A. Correct.

(See Potashner Decl., Exhibit "23", pp. 11, 17, 19, 27, 31, 36-37, & 120.)

Mr. Karamalis testified that, as the Operations Manager of DDS, he was involved in the work at the Premises. He testified that DMV hired DDS to perform the work, and that DDS was a subcontractor of DMV. Hunt was the General Contractor. Mr. Karamalis testified that DDS

was hired to install the mechanical piping from the building to the HVAC units being installed by DMV.  Regarding the installation of valves, Mr. Karamalis testified as follows:

> Q.  Am I correct in saying that part of the work that was performed by D.D.S. involved installation of certain copper piping and valves?
>
> A.  Correct.
>
> Q.  Do you know who determined what type of copper piping or what type of pipes were used by D.D.S. during that work?
>
> A.  Standard copper piping and mechanical bullnose.
>
> Q.  Is that something D.D.S. would have chosen the valves and the copper piping that was used?
>
> A.  Yes.
>
> * * *
>
> Q.  The copper piping and valves, those would have been purchased by D.D.S.?
>
> A.  Correct.
>
> Q.  Do you know if there was any other company workers that did not work for D.D.S. involved both in the installation of the copper piping and valves?
>
> A.  I'm not aware of any.

(See Potashner Decl., Exhibit "24", pp. 19-20.)

## B.    Contracts

### 1.    The DMV Subcontract

On or about June 3, 2019, Hunt, as General Contractor, and DMV, as Subcontractor, entered into a Standard Form of Agreement Between Contractor and Subcontractor, in connection with a construction project at the Premises (the "DMV Subcontract").  Pursuant to the DMV Subcontract, DMV contractually agreed to perform HVAC installation services at the Premises, including the installation of brass valves as part of the HVAC system.

The DMV Subcontract provides, in relevant part, as follows:

6

4.7.3    Subcontractor shall at its sole cost and expense maintain in full force and effect during the terms of this agreement and for one year following the term of this agreement policies of insurance of the type and in the minimum amounts stated below with companies satisfactory to the General Contractor.

(a)    Comprehensive Liability Insurance:

(i) Not less than $1,000,000 combined single limit per occurrence with coverage of not less than $2,000,000 to cover claims in the aggregate.

(ii) Such insurance shall include bodily injury, personal injury, property damage, premises and operations liability (including explosion, collapse, and underground coverage) completed operations, contractual liability; and provide severability of interest, cross liability and independent contractor's coverage.  Insurance coverage will be on an occurrence basis.

* * *

(e)    General Contractor must be named as an additional insured, per endorsements CG2010 AND CG2037 or its equivalent, and job name and location must be listed in Subcontractor's policy.

## 2.    The DDS Subcontract

On or about June 6, 2019, DMV, as Contractor, and DDS, as Subcontractor, entered into a Subcontract Agreement, in connection with the construction project at the Premises (the "DDS Subcontract").  Pursuant to the DDS Subcontract, DDS contractually agreed to perform HVAC installation services, including the installation of brass valves as part of the HVAC system.

The DDS Subcontract provides, in part, as follows:

With respect to the Work to be performed and furnished by the Subcontractor hereunder, the Subcontractor agrees to be bound to DMV by each and all of the terms and provisions of the Contract Documents between the Owner and/or General Contractor and DMV, and to assume toward DMV all of the duties, obligations and responsibilities that DMV by those Contract Documents assumes toward the Owner and/or General Contractor.

The DDS Subcontract further provides, in part, as follows:

7

17. EXHIBITS AND SCHEDULES ATTACHED

The relevant sections of the Prime Contract shall be annexed hereto as Exhibit "A" and made a part of this Subcontract (Agreement with Owner and/or General Contractor. All plans, specifications and conditions are also made a part of this Agreement.

Exhibit "B": Insurance Requirements and Indemnification and Hold Harmless Agreement.

Exhibit "B" of the DDS Subcontract provides, in part, as follows:

2. Insurance. The Subcontractor shall procure and shall maintain until final acceptance of the Work, such insurance as will protect the Contractor, all entities the Contractor is required to indemnify and hold harmless, the Owner and their officers, directors, agents and employees, for claims arising out of or resulting from Subcontractor's Work under this Contract Agreement, whether performed by the Subcontractor, or by anyone directly or indirectly employed by Subcontractor, or by anyone for whose acts Subcontractor may be liable.

a. The Subcontractor's insurance shall include … additional insured coverage for the benefit of the Contractor, Owner or anyone else the Contractor is required to name (as set forth in the schedule below), and shall specifically include coverage for completed operations.

\* \* \*

d. The additional insured coverage shall include completed operations coverage for the Additional Insureds for a period of not less than 24 months (two years) after completion of the project.

\* \* \*

j. Unless otherwise stipulated in the Contract Agreement, the Subcontractor shall maintain no less than the limits specified for each of the following insurance coverages

i. Commercial General Liability using an industry standard unmodified coverage form including contractual liability with minimum limits of $1,000,000 each occurrence, $2,000,000 aggregate with either per project or per location endorsement for property damage and bodily injury.

\* \* \*

k. Subcontractor shall, by specific endorsement to its primary commercial general liability policy…cause the coverage afforded to the Additional Insureds thereunder to be primary and non-contributory to and not concurrent

8

with any other valid and collectible insurance available to the Additional Insureds.

**C.    The Insurance Policies**

**1.    The Ohio Security Policy**

Ohio Security issued a Commercial Package Policy, with a General Liability Coverage Part, No. BKS (21) 52 92 21 99, with a policy period from March 22, 2020 to March 22, 2021, to Hunt, as the Named Insured (the "Ohio Security Policy"). Ohio Security is currently providing a defense in the Underlying Action to Hunt under the Ohio Security Policy.

The Ohio Security Policy has an applicable excess "Other Insurance" provision, which provides as follows:

**b. Excess Insurance**

**(1)** This insurance is excess over:

*** 

**(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

The Ohio Security Policy defines the term "you" as follows:

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy.

As such, the term "you" refers to Hunt in the Ohio Security Policy.

**2.    The Utica Policy**

Utica issued a Contractors Special Policy, No. ART 5144704 00, with a policy period from June 11, 2020 to June 11, 2021, to DMV, as the first Named Insured (the "Utica Policy"). The Utica Policy is subject to an Each Occurrence Limit of $1 million and a Aggregate Limit (Products/Completed Work) of $2 million.

9

The Utica Policy contains insuring agreements that provide, in relevant part, as

follows:

### COVERAGE L -- BODILY INJURY LIABILITY/PROPERTY DAMAGE LIABILITY

**We** pay all sums which an **insured** becomes legally obligated to pay as damages due to **bodily injury** or **property damage** to which this insurance applies.

The **bodily injury** or **property damage** must be caused by an **occurrence**.

This insurance applies only to **bodily injury** or **property damage** which occurs:
1. within the **coverage territory**; and
2. during the policy period.

\* \* \*

### COVERAGE N -- PRODUCTS/COMPLETED WORK

**We** pay all sums which an **insured** becomes legally obligated to pay as damages due to **bodily injury** or **property damage** arising out of the **Products/Completed Work Hazard** to which this insurance applies. The **bodily injury** or **property damage** must be caused by an **occurrence**. This insurance applies only to bodily injury or property damage which occurs:

1. within the **coverage territory**; and
2. during the policy period.

\* \* \*

### DEFENSE COVERAGE

Payments under this coverage are in addition to the **limits** for the Commercial Liability Coverage.

**We** have the right and duty to defend a suit seeking damages **for bodily injury**, **property damage**, **personal injury** and **advertising injury** which may be covered under the Commercial Liability Coverage. **We** may make investigation and settle claims or suits **we** decide are appropriate.

The Utica Policy contains an Owner, Lessees, or Contractors Endorsement – Completed

Work – Automatic Status, which provides, in relevant part, as follows:

10

Under Definitions, the definition of "insured" is amended to include each person or organization whom "you" are required to name as an additional insured on this policy by written contract or written agreement.

The written contract or written agreement must:

1. Become effective during the policy period; and

2. Be executed prior to the "bodily injury", "property damage", "personal injury", or "advertising injury"

Such person or organization is an additional insured but only with respect to liability for "bodily injury" or "property damage" caused, in whole or in part, by "your" acts or omissions or the acts or omissions of those acting on "your" behalf in performance of "your work" for such person or organization and included in the "products/completed work hazard".

The Utica Policy defines the terms "products/completed work hazard" and "your work"

as follows:

11. **Products/completed work hazard --**

**a.**     **Products hazard** means **bodily injury** or **property damage** occurring away from premises **you** own or rent and arising out of **your product** after physical possession of the products has been relinquished to others.

**b.**     **Completed work hazard** means **bodily injury** or **property damage** arising out of **your work**. It does not include work that has not been completed, or that has not been abandoned.

**Your work** is deemed completed at the earliest of the following times:

1)     when all work specified in **your** contract has been done;
2)     when all **your** work to be done at a job site has been completed if **your** contract includes work at more than one site; or
3)     when **your work** at a job site has been put to its intended use by someone other than tractor or subcontractor working on the same job site.

Work which requires further service, maintenance, correction, repair, or replacement because of defect or deficiency, but which is otherwise complete, shall be deemed completed.

\* \* \*

14. **Your work -** This means:

11

a. work or operations performed by **you** or on **your** behalf;
b. materials, parts, and equipment **you** supply for such work or operations; and
c. written warranties or representations made at any time regarding quality, fitness, durability or performance of any of the foregoing.

The Utica Policy contains an "Other Insurance" provision, as amended by endorsement,

that provides, in relevant part, as follows:

a.       Insurance under this Commercial Liability Coverage is primary except as provided u paragraph 4.c. below, or unless otherwise stated.  The amount of our liability is not reduced because of other insurance which applies to the loss on other than a primary basis.

\* \* \*

c.   Insurance under this Commercial Liability Coverage is excess over any other insurance:

1)  if the other insurance, whether primary, excess, contingent, or on any other basis, provides:

4)       fire, extended coverage, builders' risk, installation risk, or similar coverage for **your work**; or

**5)**       fire insurance for premises rented to **you;**

2)  if the other insurance applies to any loss arising out of the maintenance or use of aircraft, **autos,** or watercraft which may be covered by this policy; or

3)  if the other insurance is primary insurance and is available to **you** to coverage liability arising out of the:

a)       premises or operations;

b)       completed work; or

c)        products;

for which **you** have been added as an additional insured by endorsement to the policy.

\* \* \*

Primary and Noncontributory Insurance

12

This insurance is primary to and will not seek contribution from any other insurance available to an additional insured under "your" policy provided that:

1.    The additional insured is a Named Insured under such other insurance; and

2.    "You" have agreed in a written contract or written agreement that this insurance would be primary and not seek contribution from any other insurance available to the additional insured.

**3.    The Travelers Policy**

Travelers issued a Commercial Lines policy, with a Commercial General Liability Coverage Part, No. DT-CO-0J763233-IND-20, with a policy period from January 12, 2020 to January 12, 2021, to DDS, as the first Named Insured (the "Travelers Policy"). The Travelers Policy is subject to an Each Occurrence Limit of $2 million and a Products-Completed Operations Aggregate Limit of $4 million.

The Travelers Policy has an insuring agreement, as amended by endorsement, that provides, in relevant part, as follows:

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. We will have such right and duty to defend even if the allegations of the "suit" are groundless, false or fraudulent. . . .

The Travelers Policy defines the terms "you" and "your" as follows:

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy.

As such, the term "you" refers to DDS in the Travelers Policy.

13

The Travelers Policy contains a Blanket Additional Insured (Includes Products-Completed Operations If Required by Contract) endorsement, which provides, in relevant part, as follows:

> The following is added to **SECTION II - WHO IS AN INSURED:**
>
> Any person or organization that you agree in a written contract or agreement to include as an additional insured on this Coverage Part is an insured, but only:
>
> a. With respect to liability for "bodily injury" or "property damage" that occurs, or for "personal injury" caused by an offense that is committed, subsequent to the signing of that contract or agreement and while that part of the contract or agreement is in effect; and
>
> b. If, and only to the extent that, such injury or damage is caused by acts or omissions of you or your subcontractor in the performance of "your work" to which the written contract or agreement applies. Such person or organization does not qualify as an additional insured with respect to the independent acts or omissions of such person or organization.

The Travelers Policy contains an Additional Insured – Owner or Lessor of Premises at Which You Are Preforming or Have Performed Operations endorsement, which provides, in relevant part, as follows:

> The following is added to **SECTION II - WHO IS AN INSURED:**
>
> 1. Any person or organization shown in the Schedule Of Additional Insureds that is a premises owner, manager or lessor of premises at which you are performing or have performed operations is an insured, but only:
>
>> a. With respect to liability for "bodily injury" or "property damage"; and
>>
>> b. If, and only to the extent that, the "bodily injury" or "property damage" is caused by acts or omissions of you or your subcontractor in the performance of "your work" on or for the project, or at the location, shown in the Schedule Of Additional Insureds. The person or organization does not qualify as an additional insured with respect to the independent acts or omissions of such person or organization.

The Schedule for this endorsement provides as follows:

14

Person Or Organization:

EACH PREMISES OWNER, MANAGER, OR LESSOR THAT YOU AGREE,
BUT NOT IN A WRITTEN CONTRACT OR AGREEMENT, TO INCLUDE
AS AN ADDITIONAL INSURED ON THIS COVERAGE PART.

Project Or Location Of Covered Operations:

EACH PROJECT FOR WHICH A WRITTEN CONTRACT YOU HAVE WITH
A TENANT OF A PREMISES:

1. OWNED OR LEASED BY A PERSON OR ORGANIZATION THAT IS A
PREMISES OWNER OR LESSOR SHOWN IN THE SCHEDULE ABOVE; OR

2. MANAGED BY A PERSON OR ORGANIZATION THAT IS A PREMISES
MANAGER SHOWN IN THE SCHEDULE ABOVE.

The Travelers Policy defines the term "your work", in relevant part, as follows:

**31.** "Your work":
**a.** Means:
**(1)** Work or operations performed by you or on your behalf; and
**(2)** Materials, parts or equipment furnished in connection with such work or
operations.

The Travelers Policy contains an "Other Insurance" provision that provides, in relevant

part, as follows:

**d. Primary And Non-Contributory Insurance If Required By Written
Contract**

If you specifically agree in a written contract or agreement that the insurance
afforded to an insured under this Coverage Part must apply on a primary basis, or
a primary and noncontributory basis, this insurance is primary to other insurance
that is available to such insured which covers such insured as a named insured,
and we will not share with that other insurance, provided that:

(1) The "bodily injury" or "property damage" for which coverage is sought
occurs; and

(2) The "personal and advertising injury" for which coverage is sought is caused
by an offense that is committed;

subsequent to the signing of that contract or agreement by you.

15

Given the terms of the DMV Subcontract, Travelers specifically agreed to provide coverage to Hunt on a primary and noncontributory basis.

**D.    Tenders and Responses**

By letter dated July 17, 2020, Ohio Security (using the trade name, "Liberty Mutual") tendered the defense and indemnity for Hunt in the Underlying Action to DMV and Travelers. By letter dated September 11, 2020, Ohio Security (using the trade name, "Liberty Mutual") tendered the defense and indemnity for Hunt in the Underlying Action to DMV and Utica.  By letter dated November 10, 2020, Ohio Security (using the trade name "Liberty Mutual") tendered the defense and indemnity for Hunt in the Underlying Action to DMV and Utica.

By letter dated October 19, 2021, Utica disclaimed coverage to Hunt based on the following exclusions: (1) property damage arising out of an architect's engineer's or surveyor's rendering of or failure to render any professional services; (2) the Continuing Operations exclusion; and (3) the exclusion for claims arising out of the negligence of the additional insured.[2]  The October 19, 2021 letter did not provide any additional identified reasons for Utica's disclaimer of coverage to Hunt.

By letter dated January 17, 2023, Travelers disclaimed coverage to Hunt based on the following: (1) coverage for property damage caused by DDS's work included in the "products-completed operations hazard" only applies if there is a written contract requiring continuing

---

[2] Utica did not raise the alleged exclusions for (1) property damage arising out of an architect's engineer's or surveyor's rendering of or failure to render any professional services; or (2) the Continuing Operations exclusion in its Answer as an affirmative defense. "Federal courts treat insurer claims of policy exclusions as affirmative defenses." Sher v. Amica Mut. Ins. Co., 722 F. Supp. 3d 1176, 1188 (D. Colo. 2024)(citation and quotation omitted); Allen v. Zurich Ins. Co., 667 F.2d 1162, 1164 (4th Cir. 1982).  "Failure to plead an affirmative defense in the answer results in "the waiver of that defense and its exclusion from the case." 5 C. Wright & A. Miller, *Federal Practice & Procedure* § 1278, at 339 (1969)." Satchell v. Dilworth, 745 F.2d 781, 784 (2d Cir. 1984).

operations coverage and (2) it has not been established that the alleged property damage was caused by acts or omissions of DDS or its subcontractors in the performance of its work. The January 17, 2023 letter did not identify any additional reasons for Travelers' disclaimer of coverage to Hunt.

Interestingly, Travelers, by letter dated September 13, 2024, acknowledged a duty to defend DMV under the Travelers Policy for the Underlying Action. Although Travelers' acknowledgment of its duty to defend DMV is based on the same DDS Subcontract, claim facts, and policy language as Hunt's claims in this action, Travelers continues to fail and refuse to provide a defense to Hunt.

As a result of these disclaimers of coverage, Ohio Security was required to drop down and provide a defense to Hunt. As of November 25, 2024, Ohio Security incurred and paid the total of $22,932.19, and that amount keeps growing.

## **ARGUMENT**

### **Point I**

**UTICA AND TRAVELERS OWE HUNT A DUTY TO DEFEND**

**A.    New York Law**

The "duty to defend is triggered by the allegations contained in the underlying complaint." BP Air Conditioning Corp. v. OneBeacon Ins. Grp., 8 N.Y.3d 708, 714, 840 N.Y.S.2d 302, 305 (2007). In New York, an insurer's duty to defend is "exceedingly broad." Linchrisnental Cas. Co. v. Rapid-Am. Corp., 80 N.Y.2d 640, 648, 593 N.Y.S.2d 966, 969 (1993); see also GMM Realty, LLC v. St. Paul Fire & Marine Ins. Co., 129 A.D.3d 909, 909, 11 N.Y.S.3d 661, 662 (2d Dep't 2015) (stating that allegations must be "construed liberally" and insurer will owe defense if they "suggest a reasonable possibility of coverage"). "If the allegations of the complaint are even potentially within the language of the insurance policy,

there is a duty to defend." <u>Frank v. Linchrisnental Cas. Co.</u>, 123 A.D.3d 878, 880, 999 N.Y.S.2d

836, 838 (2d Dep't 2014).  An insurer owes a duty to defend as long as "the pleadings allege a

covered occurrence, even though facts outside the four corners of those pleadings indicate that

the claim may be meritless or not covered." <u>Fitzpatrick v. American Honda Motor Co.</u>, 78

N.Y.2d 61, 63, 571 N.Y.S.2d 672, 672 (1991).

"[I]f any of the claims against an insured arguably arise from covered events, the insurer

is required to defend the entire action." <u>Sport Rock Int'l, Inc. v. American Cas. Co. of Reading,</u>

<u>PA</u>, 65 A.D.3d 12, 17, 878 N.Y.S.2d 339, 343 (1st Dep't 2009) (citation and quotation omitted).

"The standard applies equally to additional insureds and named insureds." <u>Regal Constr. Corp.</u>

<u>v. National Union Fire Ins. Co. of Pittsburgh, PA</u>, 15 N.Y.3d 34, 37, 904 N.Y.S.2d 338, 340-41

(2010).  As such, the duty to defend arises as long as there are any allegations in a complaint that

are potentially within the scope of coverage, and it matters not that there may also be allegations

that are not covered.  <u>Id.</u>

The allegations in a third-party complaint may also trigger the duty to defend, even

where, as in the instant case, an insured is not named as a direct defendant.  <u>All State Interior</u>

<u>Demolition Inc. v. Scottsdale Ins. Co.</u>, 168 A.D.3d 612,613, 92 N.Y.S.3d 256,257 (1st Dep't

2019); <u>AVR-Powell C Development Corp. v. American States Ins. Co.</u>, No.159600/2017, 2021

WL 1331348, at *5 (N.Y. Sup. Ct. Apr. 09, 2021); <u>Axis Constr. Corp. v. Travelers Indem. Co. of</u>

<u>Am.</u>, No. 220CV1125DRHARL, 2021 WL 3912562 (E.D.N.Y. Sept. 1, 2021) (held that the

employer's insurer had the duty to defend the additional insured in an underlying personal injury

action brought by an employee in which the additional insured's third-party complaint alleged

the employer created the condition proximately causing the employee's injury).

Where two or more additional insured endorsements exist, the endorsement with the broadest grant of coverage applies.  See Vargas v. City of New York, 158 A.D.3d 523, 524, 71 N.Y.S.3d 415, 417 (1st Dep't 2018).

**B.    Utica Owes A Duty to Defend**

Gap qualifies as an additional insured on the Utica policy pursuant to the Owner, Lessees, or Contractors Endorsement – Completed Work – Automatic Status for the duty to defend. DMV, pursuant to the DMV Subcontract, agreed to include Hunt as an additional insured on its general liability policy.  The DMV Subcontract was executed prior to the accident alleged in the Underlying Action.

In addition, the Underlying Action alleges that the property damage was caused, in whole or in part, by DMV's acts or omissions or by DDS's acts or omissions, as DMV's subcontractor, in performing DMV's work for Hunt.  This is established in three ways.  First, in its Bills of Particulars, Gap specifically alleges that DMV's negligence was a cause of the alleged property damage.  Second, the Third-Party Complaint in the Underlying Action specifically alleges that DMV was a cause of the loss.  See City of New York v. Evanston Ins. Co., 39 A.D.3d 153, 158, 830 N.Y.S.2d 299, 303 (2d Dep't 2007); Travelers Prop. Cas. Co. of Am. v. Harleysville Ins. Co. of New York, 67 Misc. 3d 1227(A), 2020 WL 3089269, (Sup. Ct. N.Y. Cty. Jun. 5, 2020). Third, the facts outside of the complaint compel the conclusion that the claim is covered. Fitzpatrick v. American Honda Motor Co., 78 N.Y.2d 61, 63, 571 N.Y.S.2d 672, 672 (1991) (held that even where the pleadings do not allege a covered claim, facts outside the pleadings may give rise to a duty to defend).  Here, the facts establish, and it is not disputed, that the leaks were caused by the failure of Apollo ball valves that were installed as part of the installation of an HVAC system at the Premises.  DMV's subcontractor, DDS, selected and purchased the

19

Apollo ball valves and installed them. If there was any fault or negligence here, it was caused by

DDS, which was working on behalf of DMV.

Accordingly, this Court should hold and determine that Utica owes Hunt a duty to defend

for the Underlying Action.

## C.    Travelers Owes A Duty to Defend

Gap qualifies as an additional insured on the Travelers policy pursuant to both the

Blanket Additional Insured (Includes Products-Completed Operations If Required by Contract)

endorsement and the Additional Insured – Owner or Lessor of Premises at Which You Are

Preforming or Have Performed Operations endorsement. DDS agreed to include Hunt as an

additional insured on its general liability policy pursuant to the DDS Subcontract. The leaks

alleged in the Underlying Action occurred subsequent to the signing of the DDS Subcontract.

In addition, the Underlying Action alleges that the property damage was caused, in whole or in

part, by DDS's acts or omissions. This is established in three ways. First, in its Bills of

Particulars, Gap specifically alleges that DDS' negligence was a cause of the alleged property

damage. Second, the Third-Party Complaint in the Underlying Action specifically alleges that

DDS was a cause of the loss. See City of New York, 39 A.D.3d at 158, 830 N.Y.S.2d at 303;

Travelers Prop. Cas. Co. v. Harleysville, 67 Misc. 3d 1227(A), 2020 WL 3089269. Third, the

facts outside of the complaint compel the conclusion that the claim is covered. Fitzpatrick, 78

N.Y.2d at 63, 571 N.Y.S.2d at 672. Here, again, the facts establish, and it is not disputed, that

the leaks were caused by the failure of Apollo ball valves that were installed as part of the

installation of an HVAC system at the Premises. DDS, selected and purchased the Apollo ball

valves and installed them. If there was any fault or negligence here, it was caused by DDS. The

claims against Hunt thus are not based upon the independent acts or omissions of Hunt. Rather, they are based on the dependent acts of DDS in selecting the valves to use and in installing them.

Accordingly, this Court should determine and hold that Utica and Travelers each owe Hunt a duty to defend for the claims in the Underlying Action.

## Point II

### UTICA AND TRAVELERS OWE HUNT A DUTY TO INNEMNIFY

The determination of the duty to indemnify is not premature before an underlying action is decided if the elements of coverage are not at issue in the underlying tort action. One Reason Rd., LLC v. Seneca Ins. Co., Inc., 163 A.D.3d 974, 978, 83 N.Y.S.3d 235, 240 (2d Dep't 2018) ("a declaration as to its general duty to indemnify the landlord in the underlying action may be made at this juncture, even though there has been no finding of negligence"); United States Underwriters Ins. Co. v. Image By J & K, LLC, 335 F. Supp. 3d 321, 345 (E.D.N.Y. 2018) ("A declaratory judgment as to indemnification is not 'premature' in this case because the duty to indemnify does not rely on any facts at issue in the *LeClerc Action*."); Liberty Ins. Corp. v. New York Marine & Gen. Ins. Co., No. 22CV1081 (DLC), 2023 WL 2597053, at *8 (S.D.N.Y. Mar. 22, 2023). Although Hunt has not been determined liability in the Underlying Action, this Court may grant contingent indemnification. See Zurich Am. Ins. Co. v. Scottsdale Ins. Co., No. 22-CV-364 (JGLC), 2024 WL 1138917, at *10 (S.D.N.Y. Mar. 15, 2024).

In Bedford Cent. Sch. Dist. v. Com. Union Ins. Co., 295 A.D.2d 295, 742 N.Y.S.2d 671 (2d Dep't 2002), Bedford Central School District (the "School District") allowed Iona Preparatory School ("Iona") to use one of its middle schools for an obstacle course event. The School District owned the premises where the obstacle course took place. In accordance with this agreement, Iona purchased an insurance policy from Commercial Union Insurance Company ("Commercial Union") naming the School District as an additional insured "with respect to

21

'liability arising out of your [Iona's] operations or premises owned by or rented to you [Iona].'"

Id. at 296, 742 N.Y.S.2d at 673.  A child was injured while completing the obstacle course and

commenced a suit seeking recovery for bodily injuries.  The Appellate Division held that, based

on the allegations and the language of Commercial Union's policy, Commercial Union had a

duty both to defend and indemnify the School District for the underlying action, reasoning as

follows:

> **The Supreme Court properly determined that Commercial Union Insurance Company (hereinafter Commercial Union) was obligated to defend and indemnify the District** … in the underlying action, on a 50/50 basis pursuant to an insurance policy issued by Commercial Union to Iona, which named the District as an "additional insured," but only with respect to "liability arising out of your [Iona's] operations or premises owned by or rented to you."
>
> The subject insurance policy contains provisions which are ambiguous and therefore must be construed against the insurer, the drafter of the document (*citations omitted*).  **Moreover, although the Challenge course was owned by the District when the infant plaintiff in the underlying action sustained his injuries, and was supervised by a District employee, the infant plaintiff's injuries arose out of Iona's "operations."**  The students were on a class field trip organized by Iona, an educational institution which arranged for the high school students to use the District's Challenge course, transported the students there for that purpose, and provided faculty to supervise the students while at the District's facility.  Under the circumstances, the plaintiffs are entitled to coverage pursuant to the additional insured endorsement in the policy since the underlying action arose out of Iona's "operations."  (Emphasis supplied.)

Id.; see also Maldonado v. Kissm Realty Corp., 18 A.D.3d 627, 628, 796 N.Y.S.2d 619, 621 (2d

Dep't 2005).

    Utica and Travelers, having breached their duty to defend, have the burden of

establishing that they do not have a duty to indemnify.  Servidone Const. Corp. v. Sec. Ins. Co.

of Hartford, 64 N.Y.2d 419, 425, 488 N.Y.S.2d 139, 143 (1985).

    As discussed above, Utica and Travelers both owed and breached their duty to defend

Hunt for the Underlying Action.  The existence of the contracts requiring additional insured

coverage are beyond dispute. The determinative issue on the duty to indemnify will be whether the liability is caused, in whole or in part, by their Named Insured's acts or omissions or the acts or omissions of those acting on their Named Insured's behalf.

Here, based on the deposition testimony in the Underlying Action and the contracts, it seems clear that, if there is any liability, that liability was caused, in whole or in part, by DDS. It is undisputed that DDS purchased the Apollo ball valves that failed, and DDS installed them. The theory of Gap's cases is that "[t]he valve fractured due to overtightening of the valves." As such, if Hunt has any liability, that liability will be caused by the acts or omissions of an entity acting on DMV's (Utica's Named Insured's) behalf in the performance of DMV's work for Hunt. That undisputed fact establishes Utica's contingent duty to indemnify Hunt.

Similarly, to satisfy the requirements for the duty to indemnify under the Travelers Policy, if Hunt has any liability, that liability will be caused by the acts or omissions of Travelers' Named Insured, DDS. That undisputed fact establishes Travelers' contingent duty to indemnify Hunt.

The sole contingency for both Utica's and Travelers' respective duties to indemnify is whether Hunt will be found liable.

Accordingly, because Utica and Travelers cannot establish their burden to show that an issue of facts exists that any liability of Hunt was not caused by DDS, this Court should determine that Utica and Travelers owes Hunt a duty to indemnify under their respective policies.

23

**Point III**

**THE UTICA POLICY AND THE TRAVELERS POLICY APPLY
PRIMARY AS COMPARED TO THE OHIO SECURITY POLICY**

"Where the same risk is covered by two or more policies, each of which was sold to provide the same level of coverage … priority of coverage (or, alternatively, allocation of coverage) among the policies is determined by comparison of their respective 'other insurance' clauses." Sport Rock Int'l, 65 A.D.3d at 18, 878 N.Y.S.2d at 344; see also Fieldston Prop. Owners Assoc., Inc. v. Hermitage Ins. Co., 16 N.Y.3d 257, 264, 920 N.Y.S.2d 763, 767 (2011) (holding that courts must look to the language of the applicable policies' "Other Insurance" provisions to determine the priority of coverage between insurers). Where one insurer's "Other Insurance" provision provides for primary or pro rata insurance and another insurer's "Other Insurance" provision provides for excess insurance, the insurer with the primary other insurance provision will be deemed to apply first. See Tishman Constr. Corp. v. American Mfrs. Mut. Ins. Co., 303 A.D.2d 323, 324, 757 N.Y.S.2d 535, 537 (1st Dep't 2003); Maxwell v. Toys "R" US-NY Ltd. P'ship, 269 A.D.2d 503, 504, 702 N.Y.S.2d 651, 652-53 (2d Dep't 2000).

In the case at bar, the Utica Policy has an applicable primary "Other Insurance" provision applicable to Hunt for the Underlying Action as compared to the Ohio Security Policy . The Travelers Policy also has an applicable primary "Other Insurance" provision applicable to Hunt for the Underlying Action as compared to the Ohio Security Policy. The Ohio Security Policy has an applicable excess "Other Insurance" provision applicable to Hunt for the Underlying Action as compared to the Utica Policy and the Travelers Policy.

Where, as here, one of three concurrently applicable policies contains an excess "Other Insurance" provisions and the other two policies contain a primary "Other Insurance" provision, the excess provision should be given effect and the coverage under the policy containing the

excess provision should not come into play until the coverage under the policies containing the primary clause has been exhausted. Fieldston Prop. Owners, 16 N.Y.3d at 265, 920 N.Y.S.2d at 768; Tishman Constr. Corp., 303 A.D.2d at 324, 757 N.Y.S.2d at 537; Maxwell, 269 A.D.2d at 504, 702 N.Y.S.2d at 652-53.

Accordingly, pursuant to Fieldston Prop. Owners, Tishman Constr. Corp., and Maxwell, this Court should hold and determine that the coverage afforded by the Ohio Security Policy is excess over the coverage afforded by the Utica Policy and the Travelers to Hunt for the Underlying Action.

## CONCLUSION

For the above-cited reasons, this Court should grant Ohio Security's motion for summary judgment in all respects.

Dated:    White Plains, New York
          February 12, 2025

                                        Respectfully submitted,

                                        JAFFE & ASHER LLP

                                        By: _____
                                            Marshall T. Potashner, Esq.
                                        Attorneys for Plaintiff
                                        OHIO SECURITY INSURANCE COMPANY
                                        445 Hamilton Avenue, Suite 405
                                        White Plains, New York  10601
                                        (212) 687-3000